COURT OF APPEALS OF VIRGINIA


Present: Judges Elder, Frank and Felton
Argued at Richmond, Virginia


EARL STEVEN FLOYD
                                    MEMORANDUM OPINION* BY
v.    Record No. 1872-02-2          JUDGE ROBERT P. FRANK
                                         APRIL 22, 2003
COMMONWEALTH OF VIRGINIA


           FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
               John F. Daffron, Jr., Judge Designate

           Craig S. Cooley for appellant.

           Leah A. Darron, Assistant Commonwealth
           Attorney (Jerry W. Kilgore, Attorney General,
           on brief), for appellee.


     Earl Steven Floyd (appellant) was convicted in a bench trial

of manufacturing marijuana, not for his own use, in violation of

Code § 18.2-248.1(c).  On appeal, he contends the trial court

erred in finding the evidence was sufficient to prove he was

growing the marijuana "not for personal use."  For the reasons

stated, we affirm his conviction.

                            BACKGROUND

     On October 25, 2001, Chesterfield Narcotics Detective Robert

Cerullo and Virginia State Police First Sergeant John Ruffin

executed a search warrant at appellant's home in Chesterfield

County.  They discovered a "nursery room" inside appellant's

_____

     * Pursuant to Code § 17.1-413, this opinion is not
designated for publication.

bedroom closet, containing grow-lights and several small marijuana plants, "just in the initial stage of growing."  The officers also discovered a hidden compartment in the bedroom wall, containing two fire safes, and another hidden compartment in the bedroom floor under the carpet.  The police also saw several "VCR type" recording devices that were hooked to video cameras that surveyed the exterior of the residence.

In the bathroom off the bedroom, the officers found "monitors for exterior surveillance equipment."  They determined that three cameras were focused on the exterior of the house.  The police did not see an interior camera, but they did observe a motion sensor.

In this same area, the police seized nine one-gallon size baggies, each containing a different quantity of marijuana.  Each baggy also contained a piece of paper with a number/letter code on it.  The police also found a can containing many "little ends" of marijuana cigarettes, which First Sergeant Ruffin indicated could be consistent with "heavy, heavy use."  The police found forty-five packages of rolling papers and a smoking device, but did not recover any scales, cell phones, guns, or financial records indicating sales.  Some ammunition was recovered.

The police also discovered a large, hidden, underground room, accessed through a closet in the den, which served as a "main growing room."  The room contained tanks of nitrous oxide, halogen grow-lights with electric timers, dirt, fertilizer, and an automated watering system.  First Sergeant Ruffin testified this

-

growing operation was "very sophisticated, very well thought out."

Ruffin valued the equipment at approximately $4,972,[1] based on

prices in catalogs that he found in appellant's home.

In this grow room, the officers recovered approximately 260

marijuana plants in various stages of development.  Fifteen of the

plants were mature.  Several of these mature plants had been used

for "cloning," a process used to produce higher-quality marijuana.

Written information attached to these larger plants corresponded

to the code on the paper found in the nine baggies of marijuana,

apparently indicating which plant had produced that marijuana.

Overall, 3.4 pounds of marijuana were recovered in the house.

First Sergeant Ruffin testified that, if allowed to proceed

to harvest, each plant in the grow room would yield three ounces

of processed, "bud" marijuana.[2]  By his calculations, a person

would have to smoke seven marijuana cigarettes each hour,

twenty-four hours a day, seven days a week for a year in order to

consume the amount of marijuana appellant's grow room would

produce.  Both Detective Cerullo and First Sergeant Ruffin

testified from their experience and training that the amount of

---

[1] According to the officer, this estimate did not include
several items found in the room, such as "CO2 tanks, refills for
CO2, plant food, nutrients bucket, soil, and fertilizer."

[2] The officer also testified, "The federal government states
that fifty plants or more that [sic] are seized, you can get a
kilo of processed marijuana per plant.  The State figures it as
one pound per plant."  He acknowledged that his figure went "a
step further on the defense behalf."

-

marijuana seized and its packaging were inconsistent with personal use.

The appellant was not present when the police began the search, but returned home while the police were executing the warrant. He told the officers he grew the marijuana for his personal use and that he smoked two to three marijuana cigarettes per hour every day. He stated he did not sell marijuana, but used it as medical treatment for his eye condition.

First Sergeant Ruffin testified that the 3.4 pounds of marijuana recovered would last four to six months at appellant's stated use. However, he explained that THC, the psychoactive drug in marijuana, has a limited "shelf life." Ruffin testified that marijuana must be used fairly quickly, as it loses fifty percent of its THC content within sixty days of harvest, and another fifty percent within six months of harvest. After twenty-four months, only a trace of THC remains.

Dana Lester, appellant's on-and-off girlfriend for twelve years, testified she had lived with appellant "off and on for a couple of years." She met him in 1990, and he was selling marijuana at that time. She learned in 1994 that he grew marijuana, and she assisted him with "cloning." She knew the price for his marijuana, explaining it was more expensive than other street marijuana because "it was high quality." She last saw appellant sell marijuana in January 2001. Appellant had "never been employed," according to Lester.

-

Lester testified that, not only did she buy marijuana from appellant, but she also observed "lots and lots" of sales and "lots and lots" of money. Appellant told Lester he would purchase assets and title vehicles in his mother's name. First Sergeant Ruffin testified drug dealers will hide assets by putting property in other people's names.

Lester was a five-time convicted felon. At the time of trial, Lester had been jailed since April 2001. She stated she had volunteered to testify against appellant, but admitted that an offense carrying a mandatory, minimum five-year term was nolle prossed by the Hanover Commonwealth's Attorney in November 2001. Another charge was dismissed before she spoke with the police about appellant. Lester provided the police with the names of several of appellant's customers, but these people did not testify.

An optometrist testified he had treated appellant for "end-stage" glaucoma, caused by a traumatic injury to appellant's face. This illness is painful, and marijuana is a legitimate treatment to ease the pain.

Appellant, a convicted felon, admitted growing marijuana for his personal use, to treat his glaucoma. He further admitted smoking two to three marijuana cigarettes per hour or about "20 or so a day." He denied selling marijuana and denied Lester had assisted him. He explained the surveillance equipment was to monitor his mother, who had Alzheimer's and would walk off

-

aimlessly.  Appellant indicated his only source of income is $300 a month in spousal support and $600 a month in disability compensation.

On cross-examination, appellant conceded he had purchased $17,000 worth of gold coins in 2000.  Forms completed by the coin dealers indicated appellant had represented himself as a cameraman or a government employee with an annual income of $25,000 to $50,000.  Appellant denied providing that information.  He explained that he bought the coins to resell at a profit.  He purchased the coins by wire transfers and with his credit card.

Appellant also admitted that in 1999, he purchased a used car for a friend, Carolyn Kimbrough, for $15,000 from a rental agency in North Carolina.  He admitted he did not give Kimbrough the title to the car for six months.  He explained that Kimbrough had not given him enough money to purchase the car, so appellant put $5,000 of the purchase price on his credit card.  When she repaid him, he alleged, he transferred title to her.

## ANALYSIS

Appellant admits he manufactured the marijuana.  However, he maintains the evidence was insufficient to prove the marijuana was "not for [his] personal use."  The Commonwealth does not contest that appellant, in part, grew the marijuana for his personal use, but maintains the quantity grown was far in excess of the amount appellant could use for his personal, medical use.

-

When considering sufficiency issues, "we review the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom." Martin v. Commonwealth, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987). In such cases, "'it is our duty to look to that evidence which tends to support the verdict and to permit the verdict to stand unless plainly wrong.'" Johnson v. Commonwealth, 35 Va. App. 134, 139, 543 S.E.2d 605, 607 (citing Snyder v. Commonwealth, 202 Va. 1009, 1016, 121 S.E.2d 452, 457 (1961)), aff'd, 37 Va. App. 187, 555 S.E.2d 419 (2001) (en banc).

"The credibility of the witnesses and the weight accorded the evidence are matters solely for the fact finder who has the opportunity to see and hear that evidence as it is presented." Sandoval v. Commonwealth, 20 Va. App. 133, 138, 455 S.E.2d 730, 732 (1995). "The trier of fact is not required to accept a party's evidence in its entirety, but is free to believe and disbelieve in part or in whole the testimony of any witness. Yellardy v. Commonwealth, 38 Va. App. 19, 22, 561 S.E.2d 739, 741 (2002) (citation omitted).

Circumstantial evidence is sufficient to sustain a finding of guilt if it excludes those reasonable hypotheses of innocence that "flow from the evidence." Hamilton v. Commonwealth, 16 Va. App. 751, 755, 433 S.E.2d 27, 29 (1993). Whether a hypothesis of innocence is reasonable is a finding of fact, binding on appeal unless plainly wrong. See Glasco v.

-

<u>Commonwealth</u>, 26 Va. App. 763, 774, 497 S.E.2d 150, 155 (1998), <u>aff'd</u>, 257 Va. 433, 513 S.E.2d 137 (1999).

Here, appellant claims all the marijuana was produced for his personal use. Accepting appellant's testimony that he needed the marijuana to treat his glaucoma, however, did not preclude the trial court from finding that he also grew the marijuana for sale. The trial court was not constrained to accept the entirety of appellant's explanation for the drugs found in his home. See <u>Yellardy</u>, 38 Va. App. at 22, 561 S.E.2d at 741.

Numerous factors can be examined to determine whether the evidence proves a drug was manufactured for personal use and/or for sale. See <u>Monroe v. Commonwealth</u>, 4 Va. App. 154, 156-57, 355 S.E.2d 336, 337 (1987). In this case, both officers testified that the quantity of marijuana seized was inconsistent with personal use. First Sergeant Ruffin explained that the plants found in appellant's grow room would produce more marijuana than appellant could use in a year, even if he smoked the drug twenty-four hours a day.

Additionally, appellant's marijuana growing operation was characterized as "sophisticated." The surveillance equipment and monitoring of the exterior of appellant's home suggest a distribution operation, i.e., monitoring activity outside the house to protect his business. The cost of the operation, including the building of the grow room and the apparatus

-

involved in his operation, suggest a monetary return on this investment was necessary, especially given appellant's limited income.

While on an income of only $900 a month, appellant purchased gold coins for $17,000 and a used car for $15,000. His purchase order for the coins recited an income of $25,000 to $50,000. While appellant claims he made these purchases using a credit card, the documents from the organization that sold the gold coins indicate most of the purchases were through wire transfers of funds.

Although not specifically mentioned in the trial court's findings, Lester's testimony also supported the finding of guilt. She testified appellant sold marijuana as late as January 2001. She knew the price at which he sold the drug, and she was familiar with the procedures he used to produce the marijuana. Although she was a convicted felon, and perhaps she would receive some favorable treatment in her own cases because of her willingness to testify, her testimony was not inherently incredible. See Yates v. Commonwealth, 4 Va. App. 140, 144, 355 S.E.2d 14, 16 (1987) (finding testimony from a felon, pursuant to a plea agreement, is not inherently incredible).

Clearly the trial court rejected appellant's explanation of these events. In finding the evidence sufficient to convict, the trial court noted the volume of production, the sophistication of the operation, the security system, and the

-

underground room.  The record supports the trial court's findings.  We, therefore, affirm the judgment of the trial court.

<u>Affirmed.</u>
